UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CITIGROUP INC. SECURITIES LITIGATION | LEAD CASE<br>09 MD 2070 (SHS) |
| WESLEY ODOM,<br>　　　　　　　　　Plaintiff,<br>　　　-against-<br>MORGAN STANLEY SMITH BARNEY, LLC and CITIGROUP, INC.,<br>　　　　　　　　　Defendants. | This document relates to:<br>11 Civ. 3827 (SHS)<br><br>OPINION & ORDER |

SIDNEY H. STEIN, U.S. District Judge.

　　Plaintiff Wesley Odom, a former employee of Smith Barney Asset Management, LLC,[1] brings this suit alleging violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act"); common law fraud and negligent misrepresentation; and violations of the Florida Whistleblower's Act, Fla. Stat. §§ 448.101 *et seq*. Odom's Exchange Act and common law claims arise from alleged misrepresentations made by Citigroup during 2007 and 2008—which were the subject of multiple other lawsuits before this Court, including two securities fraud class action litigations in which settlements were approved in August 2013. *See In re Citigroup Inc. Bond Litig.*, No. 08 Civ. 9522 (SHS), 2013 WL 4427195 (S.D.N.Y. Aug. 20, 2013); *In re Citigroup Inc. Sec. Litig.*, Nos. 09 MDL 2070 (SHS), 07 Civ. 9901 (SHS), 2013 WL 3942951 (S.D.N.Y. Aug. 1, 2013).

---

[1] Defendant Morgan Stanley Smith Barney, LLC is a successor-in-interest to Smith Barney Asset Management, LLC and was, during the relevant time period, wholly owned by defendant Citigroup, Inc.

Unlike the plaintiffs in those actions, however, Odom does not allege that he purchased or sold Citigroup securities during the time period in which these misrepresentations allegedly affected the stock price. Rather, he asserts what are known as "holder" claims, alleging that he owned Citigroup stock during this period and refrained from selling it—i.e. he continued to hold the stock—due to Citigroup's misrepresentations. Odom's Whistleblower's Act claim is based upon his alleged forced resignation in retaliation for advising his clients to opt out of premium Citigroup accounts.

Citigroup has moved to dismiss Odom's complaint, advancing a number of theories. Odom's federal securities fraud claims are dismissed with prejudice because holder claims are not cognizable under the Exchange Act. Odom's state law fraud and negligent misrepresentation claims also must be dismissed with prejudice because they are preempted pursuant to the Securities Litigation Uniform Standards Act ("SLUSA"). Even if SLUSA did not preempt these state-law claims, however, they would fail to state a claim on the merits based upon substantially the same analysis this Court utilized in dismissing another litigation in this multidistrict litigation ("MDL"), *AHW Investment Partnership v. Citigroup Inc.*, Nos. 09 MD 2070 (SHS), 10 Civ. 9646 (SHS), 2013 WL 5827643 (S.D.N.Y. Oct. 30, 2013). Finally, because the factual allegations relevant to Odom's Florida Whistleblower's Act claim do not overlap with the facts underlying the Citigroup securities claims consolidated before this Court, the Court recommends that the Judicial Panel on Multidistrict Litigation ("JPML") remand that claim to the U.S. District Court for the Northern District of Florida, from which this action was transferred, pursuant to JPML Rule 10.1(b).

## I. BACKGROUND

### A. Factual Allegations

According to the complaint,[2] Odom was employed by Smith Barney as a financial advisor in its Pensacola, Florida office from 1992 to 2009. (Compl. ¶ 1, 7.) During the relevant time period, Smith Barney was part of the Citigroup Asset Management business unit and was wholly owned by Citigroup. (*Id.* at ¶¶ 8-9.) Citigroup and Smith Barney encouraged employees to purchase Citigroup stock through various incentive programs, and Odom purchased shares of Citigroup during his employment. (*Id.* at ¶¶ 12-13.) Specifically, he acquired approximately 10,233 shares during or before 2006; he was awarded options to purchase 354 shares of stock in 1998, 1999, and 2000; and he purchased an unstated number of additional shares through his 401(k) account. (*Id.* at ¶ 13.)

As set forth above, the Citigroup misrepresentations alleged in this action are based on the same conduct as those alleged in the *Securities* and *Bond* actions before this Court—although the class action complaints are considerably more detailed and include multiple additional allegations of misrepresentations or omissions. The allegations advanced in this litigation can be summarized as follows. Beginning in approximately 2005, Citigroup increased its exposure to subprime residential mortgages, both originating such loans and packaging them to form residential mortgage backed securities ("RMBS")—which in turn were packaged into collateralized debt obligations ("CDOs").[3] (*Id.* at ¶ 14.) In mid-2007, Citigroup began making public statements in conference calls and press releases that seriously underrepresented its exposure to subprime RMBS. (*Id.* at ¶¶ 16-20.) Specifically, Odom alleges that Citigroup made material misstatements during a July 20, 2007 telephone conference (*id.* at ¶ 17); a July 27, 2007 conference call (*id.* at ¶ 18); and an October 1, 2007 "press release and recorded telephone announcement" (*id.* at ¶ 20). The *Securities*

---

[2] "In evaluating a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiffs' favor." *AHW*, 2013 WL 5827643, at *1 n.2.

[3] The various financial instruments discussed here are explained in detail in *In re Citigroup Inc. Securities Litigation*, 753 F. Supp. 2d 206, 214-17 (S.D.N.Y. 2010).

complaint references both the July 20 and October 1 statements. (*See, e.g.*, *In re Citigroup Inc. Securities Litig.*, Nos. 09 MDL 2070 (SHS), 07 Civ. 9901 (SHS), Amended Consolidated Class Action Compl. ("*Securities* Compl.") ¶¶ 435, 827, 828, 890, 895, 1189-93; Dkt. No. 74.)

By November 2007, the company determined that downgrades in the ratings of certain tranches of subprime-RMBS-backed CDOs would have a negative effect on a significant portion of its CDO portfolio, at which point Citigroup "disclosed the actual amount of its subprime exposure" for the first time—a development that "shocked the market." (Compl. ¶¶ 22-26.) Citigroup's stock dropped precipitously following these disclosures. (*Id.* at ¶ 26.) During the same time—fall of 2007—Citigroup had also been understating its exposure to RMBS in the form of financial products known as structured investment vehicles ("SIVs"). (*Id.* at ¶¶ 27-29.) This exposure was disclosed in December 2007. (*Id.* at ¶ 29.) The combined effect was "record-breaking" losses in the last quarter of 2007. (*Id.* at ¶ 30.)

Notwithstanding its previous disclosures, Citigroup continued to understate its ongoing exposure to RMBS throughout 2008; repeatedly failed to take necessary write-downs or increase its loan-loss reserves to account for the risk associated with the mortgage-backed securities it had retained; and insisted that its position in the financial markets remained strong. (*Id.* at ¶¶ 32-37.) Odom points to two specific examples in the complaint: a "mid-September 2008" statement by then-Citigroup-CEO Vikram Pandit, in which he called Citigroup "a pillar of strength in the markets" (*id.* at ¶ 35); and a November 17, 2008 "employee Town Hall" meeting, during which Pandit "again noted Citi's strong capital position" (*id.* at ¶ 36). Again, the *Securities* complaint references these statements. (*See Securities* Compl. ¶¶ 926, 930, 963, 992, 1099, 1101, 1239.)

In August 2008, Citigroup agreed to repurchase $7.3 billion in auction rate securities ("ARS")—which it had secretly been propping up for months by injecting capital liquidity into the ARS market when demand fell short—pursuant to a settlement agreement with the New York Attorney General. (Compl. ¶ 34.) Finally, in November 2008, Citigroup accepted a $326 billion bail-out package from the federal government, intended "largely to guarantee the at-risk subprime mortgages and toxic assets Citi could not sell." (*Id.* at ¶ 37.) By January 16, 2009, the company's

4

stock was trading at $3.50 per share—an "almost 93 percent" decrease from October 2007. (*Id.* at ¶ 40.)

In addition to these misrepresentations aimed at the market generally, Odom represents that he was the recipient of additional false information as a Smith Barney employee. Specifically, in early 2007, the regional director of Smith Barney assured the Pensacola employees that Citigroup "was not involved in that type of business"—meaning subprime mortgages—that employees "had nothing to fear from the fallout," and that they should "be patient about their holdings." (*Id.* at ¶ 41.) By mid-2007, "Smith Barney no longer allowed its employees to access" outside analyst opinions about the company, instead providing them with research from "a little known outside analyst who expressed confidence in the strength of Citi and predicted that the stock should be priced at $60-$65 within a matter of months." (*Id.* at ¶ 42.) When Odom inquired about the state of the ARS market in late 2007, he was told by his boss and by the Citigroup ARS sales desk "that the market was fine and that ARS continued to present great investment vehicles for clients." (*Id.* at ¶ 43.) In 2008, "[w]hen the financial crisis [had] worsened," Smith Barney management allegedly continued to assure employees about the bright future of Citigroup and that "the best was yet to come." (*Id.* at ¶¶ 45-46.)

Odom alleges that he held his stock throughout 2007 in reliance on these optimistic representations about Citigroup's current status and future. (*Id.* at ¶ 47.) In 2008, he "attempted" to sell some of his holdings, but was told by the Pensacola office's acting manager "that only the 'real' manager could authorize the sale." (*Id.*) Odom was "eventually" able to sell his stock, but "only after the price of the stock had further decreased." (*Id.*) Odom alleges that he "lost in excess of $600,000 due to the decline in value of his Citi stock." (*Id.* at ¶ 56.)

Throughout 2008, Smith Barney "strongly encouraged its financial advisors to market Citi preferred securities to their clients," and in 2009 "when the preferred market began to collapse," it "prohibited" advisors from counseling clients to sell preferred securities. (*Id.* at ¶ 51.) The company also, in spring of 2009, told advisors to market Citigroup "Gold" accounts—which "offer competitive CD rates, but are burdened with very high monthly charges"—to clients. (*Id.* at ¶ 52.) Odom nonetheless chose

5

to inform clients about those higher fees and explain what Odom refers to as an "opt out procedure." (*Id.* at ¶ 53.) After confirming that he had been doing this, Odom was asked to resign by his manager, "or she would have to fire him." (*Id.*) Odom resigned on May 4, 2009. (*Id.*)

### B. Procedural History

Odom filed a complaint in the First Judicial Circuit, Escambia County, Florida in January 2011. He asserted six causes of action: unpaid wages; conversion; violation of the Florida Whistleblower's Act; common law fraud; negligent misrepresentation; and violation of Section 10(b) and Rule 10b-5 of the Exchange Act. Defendants removed the action to the U.S. District Court for the Northern District of Florida the next month.

In March 2011, following a notice of tag-along action by defendants, the JPML conditionally transferred this action to this Court as part of the Citigroup MDL. Odom moved to vacate the conditional transfer order or, in the alternative, for severance of the first three counts and their remand to the Northern District of Florida. The JPML ordered the first two counts—unpaid wages and conversion—severed and transferred back to the Northern District of Florida; it transferred the Florida Whistleblower's Act, common law fraud, negligent misrepresentation, and Exchange Act claims to the MDL.

In its order, the JPML stated that the fraud, negligent misrepresentation, and Exchange Act claims "clearly involve common questions of fact with the actions previously transferred to MDL No. 2070"—which "centralized actions involving allegations that the Citigroup defendants unlawfully misled investors, with material misstatements or omissions in Citigroup's disclosures, among other things, about the nature of . . . in particular, [Citigroup's] holdings in and exposures to subprime-related assets"—and that transfer of these claims would "serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation." (Order of Transfer dated May 23, 2011, Ex. 2 to Decl. of Susanna M. Buergel dated July 22, 2011; Dkt. No. 21.) It also observed that although "[t]he question of transfer of the whistle-blower claim . . . is a closer call," it would grant the transfer to allow this Court "to determine the level of overlap between that claim and the claims pending

in the MDL and whether the whistle-blower issues should be separately remanded to the transferor court in advance of the other claims." (*Id.*)

Citigroup's motion to dismiss the complaint is currently before this Court.

## II. ANALYSIS

Citigroup has advanced a number of theories pursuant to which it claims that Odom's complaint should be dismissed. Specifically, defendants contend that the federal securities laws do not cover holder claims; that SLUSA preempts Odom's common law fraud and negligent misrepresentation claims; that, even if SLUSA does not apply, plaintiff fails to state a cognizable claim for common law fraud and negligent misrepresentation; and finally, that plaintiff has not stated a claim pursuant to the Florida Whistleblower's Act.[4] For the most part, the Court finds defendants' arguments persuasive.

### A. Motion to Dismiss Standard

The court accepts all factual allegations in the complaint to be true and draws all reasonable inferences in the plaintiff's favor on this motion. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). To survive a motion to dismiss, however, the complaint must state a facially plausible claim to relief, meaning plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Such a showing "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

---

[4] Defendants also argue that Odom's holder claims are derivative in nature and should be dismissed because he fails to plead compliance with the demand requirements necessary to state a claim for a derivative action. For the same reasons set forth in *AHW*, the Court holds that Odom's claims are direct, not derivative. *See* 2013 WL 5827643, at *2-4.

7

### B. Section 10(b) and Rule 10b-5

#### 1. *No Private Remedy for Holder Claims Exists Pursuant to the Exchange Act.*

As both parties recognize, the U.S. Supreme Court has held that "one asserting a claim for damages based on the violation of Rule 10b-5 must be either a purchaser or seller of securities," and therefore, no private right of action exists pursuant to the Exchange Act based on allegations that a person *would have* sold a security, but did not do so based on a company's misrepresentations. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975). Odom clearly attempts to assert holder claims pursuant to Section 10(b) and Rule 10b-5. (*See* Compl. ¶¶ 98, 99 (alleging that Odom "held Citi stock at artificially high prices and was damaged thereby" and that "[h]ad Odom and the marketplace known of the truth concerning Citi's exposure to the subprime market, Odom would not have held his Citi stock").) Because such claims are not available pursuant to the Exchange Act, Odom's holder claims are dismissed. *See, e.g.*, *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 322 (2d Cir. 2002) ("[Section 10(b) and Rule 10b-5] standing is limited to actual purchasers or sellers of securities."); *First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 869 F.2d 175, 180 n.2 (2d Cir. 1989) ("Under *Blue Chip*, plaintiffs suing under Section 10(b) of the Securities Exchange Act of 1934 may recover only for losses that result from decisions to buy or to sell, not from decisions to hold or refrain from trading.").

#### 2. *Odom Has Not Otherwise Stated a Claim Pursuant to the Exchange Act.*

Defendants contend that Odom's complaint alleges only that he held Citigroup stock to his detriment, and that *Blue Chip Stamps* thus requires the dismissal of his Section 10(b) and Rule 10-5 claim in its entirety. Odom insists that he sufficiently states more than holder claims, insofar as he alleges once in a 101 paragraph complaint that he "purchased Citi stock through his 401(k) account in amounts currently unknown" on some unspecified date or dates. (*See* Compl. ¶ 13.)

Odom at no point, however, claims the purchase or sale of a security during the time period when Citigroup's stock price was allegedly affected

by its misrepresentations—according to the complaint, approximately July 2007 to November 2008. (Compl. ¶¶ 16-17, 36.) The only purchases of Citigroup stock specifically alleged occurred "during 2006 or in earlier years." (*Id.* at ¶ 13.) Odom's post hoc attempt to give content to an allegation about possible purchases of Citigroup stock at unknown prices of unknown amounts at unknown times through his 401(k) account does not rectify this deficiency. This single sentence simply does not provide sufficient factual content to support a reasonable inference that Odom purchased Citigroup stock during the relevant period.[5] (*See id.*) *Accord, e.g., Fraser v. Fiduciary Trust Co., Int'l*, No. 04 Civ. 6958 (RMB)(GWG), 2005 WL 6328596, at *4 (S.D.N.Y. June 23, 2005) (finding plaintiff's general allegations that he bought stock insufficient to state a purchase of securities when he "fail[ed] to allege the date(s) on which he acquired stock, the number of shares acquired, or the consideration given (if any)"); *Quantum Overseas, N.V. v. Touche Ross & Co.*, 663 F. Supp. 658, 667 (S.D.N.Y. 1987).

Even if Odom had properly alleged the acquisition of Citigroup securities during the relevant period, he has not stated an actionable claim for securities fraud. To state a valid Section 10(b) claim, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and

---

[5] In response to defendants' argument that his claims should be dismissed as holder claims, Odom asks for discovery in order to "obtain information . . . regarding the precise dates and amounts of his purchases of Citi stock." (Def.'s Mot. in Opp. 10.) Without more than unfounded speculation that such purchases occurred, there is no basis to order that discovery.

Moreover, pursuant to the stipulation of settlement in the *Securities* action, notice was sent to all potential class members who could be identified through reasonable effort—a group that consisted of all purchasers of Citigroup common stock between February 26, 2007 and April 18, 2008 and totaled more than 2.4 million notices. *See In re Citigroup Inc. Sec. Litig.*, 2013 WL 3942951, at *6 ("The claims administrator sent notices to over 2.4 million potential class members."); *see id.* at *7 ("The Court further finds that the claims administrator provided individual notice to those class members who could be identified through reasonable effort." (quotation marks and citation omitted)). If Odom did not receive such a notice, it is highly unlikely that he acquired any Citigroup stock during that period—which covers the majority of the time during which the alleged misrepresentations took place.

the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). He must also meet two heightened pleading standards. Pursuant to Federal Rule of Civil Procedure 9(b), such a complaint must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). And pursuant to the Private Securities Litigation Reform Act ("PSLRA"), it must also "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," as well as "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with regard to "each act or omission alleged to violate this chapter." 15 U.S.C. §§ 78u-4(b)(1), (2); *see also In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 231 (S.D.N.Y. 2010). Odom's complaint fails by a wide margin to achieve such specificity.

Finally, Odom's purported Exchange Act cause of action fails for two reasons in addition to the deficiency of his pleadings. First, the majority of any possible claims—those based on purchases that occurred between February 26, 2007 and April 18, 2008—have been released in the settlement of the *Securities* action. (*See In re Citigroup Inc. Sec. Litig.*, Nos. 09 MD 2070, 07 Civ. 9901, Final Judgment and Order of Dismissal with Prejudice ¶¶ 1(r), 1(v), 1(w); Dkt. No. 267.) Second, this Court has long since found the misrepresentations Odom alleges to have occurred subsequent to the *Securities* class period—optimistic statements made by Vikram Pandit in fall of 2008 (*see* Compl. ¶¶ 35-36)—to be nonactionable "expressions of 'puffery and corporate optimism' that 'do not give rise to securities violations.'" *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d at 248 (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)).

In sum, Odom has alleged only holder claims, for which Section 10(b) and Rule 10b-5 provide no private right of action. Even if his allegations regarding purchases of Citigroup stock through his 401(k) were specific enough to properly state a purchase of securities during the relevant period—which they are not—his claim fails for a number other reasons. Thus, Odom's Exchange Act claim is dismissed with prejudice.

### C. SLUSA Preempts Odom's State Law Fraud and Negligent Misrepresentation Claims.

Pursuant to SLUSA, "[n]o covered class action based upon the statutory or common law of any State . . . may be maintained in any State or Federal court by any private party alleging . . . a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1).

Here, there is no dispute that Citigroup common stock is a "covered security" or that Odom has alleged violations of state law based on misrepresentations and omissions of material fact. In addition, although Odom has not alleged that he purchased or sold Citigroup securities during the relevant time period, the Supreme Court has held in plain terms that "SLUSA pre-empts state-law holder class-action claims." *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 87 (2006). In the face of this statute and Supreme Court decision, Odom contends that his claims are not preempted by SLUSA because this lawsuit does not fall within the definition of a "covered class action." Odom stresses that he "is asserting his claims on behalf of himself only." (Def.'s Mot. in Opp. 12.)

SLUSA defines a "covered class action," as relevant here, as

any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which (I) damages are sought on behalf of more than 50 persons; and (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(B)(ii). It is undisputed that, at the time of this motion's filing, this suit had been transferred to this Court by the JPML for inclusion in the Citigroup Subprime Mortgage MDL, which includes the Citigroup *Securities* and *Bond* class actions; that it has questions of law and fact central to those two class actions; and that, although Odom here seeks damages for himself, the suits, if combined, seek damages on behalf of over two million persons.

The parties disagree, however, about whether the actions should be grouped for the purpose of determining whether Odom's lawsuit is a covered class action. Defendants assert that this lawsuit was proceeding as

11

a single action for pretrial purposes alongside the *Securities* and *Bond* class actions in the Citigroup MDL, and, therefore, Odom's suit falls within the SLUSA definition. Odom counters that his suit was never formally joined or consolidated with any of the other actions in the MDL and, for this reason, should not be grouped with those cases for the purposes of SLUSA. Defendants respond that the suits were in fact proceeding "as a single action for any purpose." Whether this action is preempted pursuant to SLUSA thus depends on whether this lawsuit was "joined, consolidated, or otherwise proceed[ed] as a single action for any purpose" with the MDL class actions.

A number of courts within this district have held that individual lawsuits raising state law claims of fraud or negligent misrepresentation should be grouped together with class action suits advancing the same allegations for SLUSA purposes when those actions are proceeding before one judge as part of an MDL. *See, e.g.*, *Amorosa v. Ernst & Young LLP* (*Amorosa II*), 682 F. Supp. 2d 351, 373-77 (S.D.N.Y. 2010) ("[T]his Court holds that an action need not have been formally joined or consolidated with other actions in order to be a 'covered class action' and subject to SLUSA's preemption provision."); *Amorosa v. Ernst & Young LLP* (*Amorosa I*), 672 F. Supp. 2d 493, 517 (S.D.N.Y. 2009) *aff'd sub nom. Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412 (2d Cir. 2011); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 03 MDL 1529 (LMM), 2010 WL 3528872, at *5 (S.D.N.Y. Aug. 30, 2010) ("The present action is one of more than 50 actions pending in this district as a multidistrict litigation in which damages are sought for more than 50 people. It is plainly a covered class action which cannot be maintained in this or any state court."); *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 671-72 (S.D.N.Y. 2007) ("[T]he 'individual actions,' once aggregated per SLUSA's instructions, are a 'covered class action' for purpose of SLUSA and are properly subject to the Act's limitations on mass actions."); *Gordon Partners v. Blumenthal*, No. 02 Civ. 7377 (LAK), 2007 WL 1438753, at *3 (S.D.N.Y. May 16, 2007) *aff'd* 293 F. App'x 815 (2d Cir. 2008) (adopting Report and Recommendation in *Gordon Partners v. Blumenthal*, No. 02 Civ. 7377 (LAK) (AJP), 2007 WL 431864 (S.D.N.Y. Feb. 9, 2007)); *In re WorldCom, Inc. Sec. Litig.*, 308 F. Supp. 2d 236, 245-47 (S.D.N.Y. 2004) (ten suits, several of which alleged only individual claims, were proceeding as a single action when their

complaints were virtually identical and they were consolidated for pretrial purposes in the same court).[6] *Cf. In re Refco Inc. Sec. Litig.*, 859 F. Supp. 2d 644, 649 (S.D.N.Y. 2012) (observing that an "MDL proceeding coordinates discovery and other pretrial proceedings, and the actions in it are accordingly proceeding as a single action for numerous purposes"). *Accord In re Enron Corp. Sec., Derivative, & ERISA Litig.*, 535 F.3d 325, 340 (5th Cir. 2008).

*Amorosa* is the closest analogue to Odom's situation. In that litigation, a single plaintiff who had opted out of a class action filed a complaint materially the same as those of approximately 200 other opt-out plaintiffs, who had filed identical complaints and were represented by common counsel. *Amorosa*, 672 F. Supp. 2d at 499, 517-18. Amorosa's action was "never formally coordinated or consolidated" with these other opt-out actions, which Judge Shirley Kram had aggregated and adjudicated collectively. *Id.* at 499, 517. The JPML had transferred Amorosa's case to the MDL Judge Kram was supervising, "where it would necessarily be handled in coordination" with those cases. *Id.* The *Amorosa* court concluded that Amorosa's lawsuit was proceeding as a single action with the other opt-out lawsuits, holding that "an action need not have been formally joined or consolidated with other actions in order to be a 'covered class action' and subject to SLUSA's preemption provision." *Id.* at 517-18. That court also noted that the facts that (1) Amorosa had agreed to a stay of proceedings in his action pending the resolution of motions to dismiss the class action and the opt-out complaints and (2) that he had filed an amended complaint "identical in all material respects" to the other plaintiffs' complaint each could have alone supported the conclusion that the lawsuits were proceeding as a single action. *Id.* at 518.

---

[6] One two-page decision held that an individual lawsuit did not proceed as a single action with a class action that alleged the same misrepresentations for SLUSA purposes because the two were "neither joined nor consolidated" and were on "separate procedural track[s]." *Ventura v. AT&T Corp.*, 05 Civ. 5718 (LLS), 2006 WL 2627979, at *1 (S.D.N.Y. Sept. 13, 2006). That short decision, however, ignores the statutory directive that two lawsuits should be grouped when they proceed "as a single action *for any purpose*," and this Court has found no S.D.N.Y. case that adopts the reasoning of *Ventura*. *See Amorosa*, 672 F. Supp. 2d at 517.

13

This Court agrees with this view of SLUSA preemption: that, even if two actions have not been formally joined or consolidated, they are proceeding "as a single action for any purpose" within the meaning of SLUSA when they are grouped together as part of an MDL. Such an interpretation adheres to Congress's purpose in enacting SLUSA, which was to make federal courts "the exclusive venue for class actions alleging fraud in the sale of certain covered securities and mandating that such class actions be governed exclusively by federal law." *Amorosa*, 672 F. Supp. 2d. at 515 (quoting *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 108 (2d Cir. 2001)). Congress further intended SLUSA to "be interpreted broadly to reach mass actions and all other procedural devices that might be used to circumvent the class action definition." *WorldCom*, 308 F. Supp. 2d at 242 (quoting S. Rep. No. 105–182, at 8 (1998)); *see also In re Fed. Nat'l Mortgage Ass'n Sec., Derivative, & ERISA Litig.*, 503 F. Supp. 2d 25, 32 (D.D.C. 2007) ("[T]he legislative history for SLUSA overwhelmingly demonstrates that although Congress recognized that it would sometimes be used to preempt individual state law claims, on balance, that was a price worth paying."). And "'[f]or *any* purpose' is about as broad a provision as Congress could draft." *Refco*, 859 F. Supp. 2d at 649 (emphasis in original).

Following these precepts, the procedural history of Odom's lawsuit demonstrates that it should be grouped with the other actions in this MDL for SLUSA purposes. Odom's action was transferred to this Court pursuant to an order of the JPML assigning it "for inclusion in the coordinated or consolidated pretrial proceedings." (Order of Transfer.) In June 2011, Odom's suit was accepted as "related" to the other cases in the MDL, and an association to the MDL was created on the docket. (*See* Ex. 3 to Buergel Decl., Entries for June 6, 2011.) As in *Amorosa*, it would therefore "necessarily be handled in coordination" with the other lawsuits in the MDL—most importantly, the *Securities* and *Bond* class actions. *See* 672 F. Supp. at 517. In addition, the misrepresentations alleged in the Odom complaint involve many of the same Citigroup statements alleged in the *Securities* and *Bond* complaints, as well as the same financial products, and the same alleged failures to disclose.

It is true that Odom did not purposefully direct his lawsuit to this Court, nor is his complaint a verbatim copy of the other complaints, nor is

14

he represented by the same counsel as other plaintiffs.[7] SLUSA, however, does not instruct the Court to consider any of these factors. *Accord Instituto De Prevision Militar v. Merrill Lynch*, 546 F.3d 1340, 1347 (11th Cir. 2008) (finding that a "bona fide individual action" was proceeding as a single action with a class action "for any purpose" and therefore, was subject to SLUSA preemption based on "the provision's unambiguous language"). Instead, it directs the Court to consider whether the lawsuits proceeded "as a single action for any purpose."

Because Odom's lawsuit proceeded with the *Securities* and *Bond* class actions as "a single action for any purpose" at the time this motion was filed, and the other statutory elements are met, it is a covered class action within the meaning of SLUSA. All of the elements of SLUSA preemption are therefore present, and the proper course is to dismiss. The Court hereby dismisses Odom's fraud and negligent misrepresentation claims with prejudice.

### D.  Even if SLUSA Did Not Preempt Odom's Common Law Claims, They Fail on the Merits.

Even if Odom's suit were not considered to be proceeding as a single action with the other lawsuits in this MDL—and his fraud and negligent misrepresentation claims were therefore not preempted by SLUSA—these claims for relief should nevertheless be dismissed because they fail to state claims.

Central to this determination is this Court's recent holding in *AHW Investment Partnership*, another litigation proceeding as part of the MDL, which presented the same factual scenario as Odom's suit: holder claims for fraud and negligent misrepresentation advanced by Florida-based investors pursuant to state law. As in this litigation, the parties in *AHW* disagreed about whether New York or Florida law applied to the plaintiffs' common law fraud and negligent misrepresentation claims. This

---

[7] The plaintiffs in one of the suits pending before this Court in the Citigroup MDL— *Markey v. Citigroup, Inc.*, No. 11 Civ. 9080 (SHS) (S.D.N.Y.)—are in fact represented by the same counsel as represents plaintiff in this litigation. The *Markey* complaint copies almost verbatim the sections of Odom's complaint setting forth Citigroup's alleged misrepresentations.

Court found, in relevant part, that: (1) New York and Florida law conflict with regard to both fraud and negligent misrepresentation causes of action; (2) pursuant to a New York choice-of-law analysis, New York had a greater interest in the litigation than Florida, and New York law therefore applied; and (3) plaintiffs failed to state a claim for either fraud or negligent misrepresentation pursuant to New York law. *AHW*, 2013 WL 5827643, at *5-12.

The analysis in this action is essentially the same, with one important difference: the jurisdiction whose rules must be applied to determine which jurisdiction's substantive law governs is Florida, rather than New York. As a general rule, "[a] federal court exercising diversity jurisdiction must apply the choice of law analysis of the forum state." *GlobalNet Financial.Com Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 382 (2d Cir. 2006). When a lawsuit is transferred as part of an MDL proceeding, the state in which the transferor court sits is the forum state, and that state's choice-of-law rules apply. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 606 n.20 (S.D.N.Y. 2001). Odom initially filed his complaint in Florida state court, meaning that Florida's choice-of-law rules apply here. Because, for the reasons explained below, New York law applies—as it did in *AHW*—the remainder of *AHW*'s analysis is applicable to this case.

Florida follows the principles stated in Section 145 of the Restatement (Second) of Conflict of Laws, applying the law of the state with "the most significant relationship to the occurrence and the parties" in tort actions. *See Green Leaf Nursery v. E.I. DuPont De Nemours and Co.*, 341 F.3d 1292, 1301 (11th Cir. 2003) (quoting *Garcia v. Pub. Health Trust of Dade Cnty.*, 841 F.2d 1062, 1064-65 (11th Cir. 1988)). Section 145 instructs courts to base their determination of which state has the most significant relationship on, inter alia, the principles stated in Section 6 of the Restatement:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6. The parties agree that Florida courts would additionally take into account the six considerations listed in Section 148 of the Restatement—which is specific to claims of fraud and misrepresentation—to determine which state had the most significant contacts: (1) "where the plaintiff acted in reliance upon the defendant's representations"; (2) "where the plaintiff received the representations"; (3) "where the defendant made the representations"; (4) the parties' domicile, residence, place of business, and place of incorporation; (5) "the place where a tangible thing which is the subject of the transaction between the parties was situated at the time"; and (6) "the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant." *Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1118 (11th Cir. 1996). Plaintiff contends that these considerations lead to the conclusion that Florida law applies, and defendants counter that these factors counsel in favor of the application of New York law.

Considering all of these factors, the Court finds that New York has the more significant relationship with the occurrence and the parties. The considerations listed in Section 6 of the Restatement, in particular, counsel in favor of the application of New York law. The comparatively strong interest of New York in determining this issue, the protection of parties' justified expectations, and a concern for uniformity and predictability are important to this determination. As explained in *AHW*, "common law fraud rules seek to deter the intentional deception of stockholders[,] . . . [a]nd New York has the greater interest in regulating its vast securities industry to ensure that application of the law leads to the appropriate admonitory effects on industry participants." 2013 WL 5827643, at *10. Moreover, the majority of the allegedly fraudulent statements or omissions, as well as the business practices and decisions that precipitated the misrepresentations, occurred in New York. (*See, e.g.*, Compl. ¶¶ 14-40.)

The exceptions are a few remarks allegedly made directly to Odom in Florida—which themselves appear to have been based on information or directives received from Citigroup's New York headquarters. (*See id.* at ¶¶ 41-46.)

For these reasons, "[a]ll parties could reasonably expect New York law to govern the conduct within its borders that forms the basis of both claims," whereas the defendants would not have reasonably expected Florida law to apply—at least no more so than the law of any jurisdiction in which a Citigroup investor resided. *See AHW*, 2013 WL 5827643, at *10. And subjecting defendants to liability in any jurisdiction in which a Citigroup investor lived at the time of a misrepresentation "would paralyze actors in the securities market," rather than engendering predictability, uniformity, and certainty. *See id.* The Section 6 factors thus tip decisively in favor of the application of New York law.

The contacts with New York and Florida are more evenly matched. That defendants are based in New York and the alleged misrepresentations were primarily made in New York must be weighed against the contacts with Florida: that Odom is a Florida resident, received the alleged misrepresentations in Florida, and allegedly decided to continue holding his Citigroup stock while he was resident in Florida. These contacts do not clearly favor either forum, and thus have little bearing on the Court's analysis.

Balancing these factors, the Court concludes that New York law applies. The Court reaffirms its previous finding that the New York Court of Appeals would not recognize holder claims and that no special relationship exists between an issuer of securities to the general public and a purchaser of such securities. *See AHW*, 2013 WL 5827643, at *7, *11-12. Thus, even if Odom's fraud and negligent misrepresentation claims were not preempted by SLUSA, dismissal for failure to state a claim would be the appropriate outcome.

### E.  Odom's Florida Whistleblower's Act Claim Should Be Remanded to the Northern District of Florida.

Odom's final cause of action is an alleged violation of the Florida Whistleblower's Act, which creates a private cause of action for employees

who are the object of retaliatory personnel actions because they "[o]bjected to, or refused to participate in, any activity, policy or practice of the employer which is in violation of a law, rule or regulation." Fla. Stat. §§ 448.102, 448.103. Odom alleges that he believed "Smith Barney was engaging in unlawful activity by prohibiting its financial advisors from advising clients to sell their Citi preferred securities, encouraging clients to establish 'Gold' accounts because Citi was in need of cash, and prohibiting advisors from advising clients regarding the financial impact of the Citi/Smith Barney joint venture and their ability to opt out" and that he objected to and refused to comply with these instructions, resulting in Smith Barney demanding his resignation. (Compl. ¶¶ 74-75.) Citigroup argues that Odom has failed to state a claim because he has not properly identified any law, rule, or regulation that Smith Barney's alleged behavior violates.

The Court declines to opine on the merits of Citigroup's argument. Instead, it observes that the allegations against Smith Barney cited in support of this claim are wholly distinct from the allegations involving Citigroup's misrepresentations regarding its RBMS and CDO holdings, which are the facts that unify and undergird the lawsuits in the MDL proceedings. The MDL has nothing to do with Citigroup's marketing of preferred securities to its clients or with "Gold" accounts; furthermore, Smith Barney's allegedly illegal activities took place exclusively in 2009, *after* the period during which Citigroup's alleged misrepresentations took place. (*See* Compl. ¶¶ 51-53.)

In its Order of Transfer, the JPML noted that this Court would have the opportunity to "determine the level of overlap between [the Florida Whistleblower's Act] claim and the claims pending in the MDL and whether the whistle-blower issues should be separately remanded to the transferor court." Having reviewed the claim in question, the Court determines there is essentially no overlap between the Florida Whistleblower's Act claim and the claims in the MDL. It therefore recommends the remand of the Whistleblower's Act claim to the Northern District of Florida, pursuant to JPML Rule 10.1(b).

### III. CONCLUSION

Odom's Section 10(b) and Rule 10-b(5) claim is dismissed with prejudice because holder claims are not cognizable pursuant to the Securities Exchange Act of 1934. Odom's common law fraud and negligent misrepresentation claims are dismissed as preempted by SLUSA. Last, finding little to no overlap between the facts and law underlying Odom's Florida Whistleblower's Act claim on one hand and the securities fraud issues that are the subject of the Citigroup MDL proceedings on the other, the Court recommends that the JPML remand this claim to the Northern District of Florida pursuant to Judicial Panel on Multidistrict Litigation Rule 10.1(b).

Dated: New York, New York
December 13, 2013

SO ORDERED:

_Sidney H. Stein_
Sidney H. Stein, U.S.D.J.